1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   FUCHIEM SAELEE,

11              Plaintiff,                    No. CIV S-09-2183 GGH

12        vs.

13
     MICHAEL J. ASTRUE,                       ORDER
14   Commissioner of
     Social Security,
15
                Defendant.
16   _____/

17              Plaintiff seeks judicial review of a final decision of the Commissioner of Social

18   Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB")

19   and Supplemental Security Income ("SSI")  under Titles II and XVI of the Social Security Act

20   ("Act").  For the reasons that follow, this court orders that plaintiff's Motion for Summary

21   Judgment is granted in part, and this matter is remanded pursuant to Sentence Four of 42 U.S.C.

22   § 405(g), to the ALJ for further analysis as directed in this opinion.  The Clerk is directed to enter

23   judgment for plaintiff.

24   BACKGROUND

25              Plaintiff, born August 1, 1960, applied on November 23, 2005 for disability

26   benefits.  (Tr. at 66, 69.)  Plaintiff alleged he was unable to work due to pain in his right arm and

                                               1

1   rib cage.  (Id. at 77, 18.)

2              In a decision dated April 25, 2008, ALJ Peter F. Belli determined plaintiff was not

3   disabled.  The ALJ made the following findings:[1]

4          1.      The claimant meets the insured status requirements of the
                   Social Security Act through December 31, 2010 (Exhibit
5                  11D).

6          2.      The claimant has not engaged in substantial gainful activity
                   since October 26, 2005, the alleged onset date (20 CFR
7                  404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et
                   seq.). (Exhibit 10D).
8
9          3.      The claimant has the following severe impairments: Status
                   post surgical repair of the right elbow (olecration fracture
                   with ORIF), and residuals of musculoskeletal injuries
10                 sustained in a motor vehicle accident (MVA) (20 CFR
                   404.1520(c) and 416.920(c)).
11

12
        [1]  Disability Insurance Benefits are paid to disabled persons who have contributed to the
13   Social Security program, 42 U.S.C. § 401 et seq.   Supplemental Security Income is paid to
     disabled persons with low income. 42 U.S.C. § 1382 et seq.  Both provisions define disability, in
14   part, as an "inability to engage in any substantial gainful activity" due to "a medically
     determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).
15   A parallel five-step sequential evaluation governs eligibility for benefits under both programs.
     See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S.
16   137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:
                Step one:  Is the claimant engaging in substantial gainful
17      activity?  If so, the claimant is found not disabled.  If not, proceed
        to step two.
18              Step two:  Does the claimant have a "severe" impairment?
        If so, proceed to step three.  If not, then a finding of not disabled is
19      appropriate.
                Step three:  Does the claimant's impairment or combination
20      of impairments meet or equal an impairment listed in 20 C.F.R., Pt.
        404, Subpt. P, App.1?  If so, the claimant is automatically
21      determined disabled.  If not, proceed to step four.
                Step four:  Is the claimant capable of performing his past
22      work?  If so, the claimant is not disabled.  If not, proceed to step
        five.
23              Step five:  Does the claimant have the residual functional
        capacity to perform any other work?  If so, the claimant is not
24      disabled.  If not, the claimant is disabled.
     Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).
25      The claimant bears the burden of proof in the first four steps of the sequential evaluation
     process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the
26   burden if the sequential evaluation process proceeds to step five.  Id.

1

2
4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

3

4

5

6

7

8

9
5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of medium work as defined in 20 CFR 404.1567(e) and 416.967(c)). Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he can also do sedentary and light work. Due to his language barrier, he is moderately impaired in his ability to understand, remember, and carry out detailed instructions.

10

11

12
6.     The claimant is capable of performing his past relevant work as an Assembler.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

13

14

15
7.     The undersigned finds that the claimant has not been under a disability, as defined in the Social Security Act, from October 26, 2005 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

16 (Tr. at 18-23.)

17 ISSUES PRESENTED

18       Plaintiff has raised the following issues: A. Whether the ALJ Failed to Fulfill his

19 Duty to Protect Plaintiff's Interests; and B. Whether the ALJ Failed to Properly Assess Plaintiff's

20 Residual Functional Capacity and Therefore Improperly Found Plaintiff Capable of Performing

21 His Past Work.

22 LEGAL STANDARDS

23       The court reviews the Commissioner's decision to determine whether (1) it is

24 based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

25 the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

26 Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v.

1  Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence

2  as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d

3  625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The ALJ

4  is responsible for determining credibility, resolving conflicts in medical testimony, and resolving

5  ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted).

6  "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one

7  rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

8  ANALYSIS

9     A. Whether the ALJ Failed to Fulfill his Duty to Protect Plaintiff's Interests

10         Plaintiff contends that the ALJ erred in two respects, by failing to advise plaintiff

11  of his right to an attorney at the administrative hearing, and by failing to re-contact plaintiff's

12  treating physician for clarification.

13         Disability hearings are not adversarial.  Dixon v. Heckler, 811 F.2d 506, 510 (10th

14  Cir. 1987) (holding that ALJ has basic duty to "inform himself about facts relevant to his

15  decision") (quoting Heckler v. Campbell, 461 U.S. 458, 471 n.1 (1983) (Brennan, J.,

16  concurring)).  The ALJ must fully and fairly develop the record, and when a claimant is not

17  represented by counsel, an ALJ must be "especially diligent in exploring for all relevant facts."

18  Tonapetyan v. Halter, 242 F.3d 1144 (9th Cir. 2001).[2]  The duty also is heightened in the case of

19  a mentally ill claimant who may not be able to protect him or herself.  Id.

20         Evidence raising an issue requiring the ALJ to investigate further depends on the

21  case.  Generally, there must be some objective evidence suggesting a condition which could have

22  a material impact on the disability decision.  See Smolen v. Chater, 80 F.3d 1273, 1288 (9th

23  Cir.1996); Wainwright v. Secretary of Health and Human Services, 939 F.2d 680, 682 (9th

24  Cir.1991).  "Ambiguous evidence . . . triggers the ALJ's duty to 'conduct an appropriate

25
26         [2] See also Crane v. Shalala, 76 F.3d 251, 255 (9th Cir.1996) (ALJ has duty to develop the record even when claimant is represented).

4

1  inquiry.'" Tonapetyan, 242 F.3d at 1150 (quoting Smolen, 80 F.3d at 1288.)  The ALJ's decision

2  may be set aside due to his failure to develop the record if the claimant can demonstrate prejudice

3  or unfairness as a result of said failure.  Vidal v. Harris, 637 F.2d 710, 713 (9th Cir. 1991).  Thus,

4  the Ninth Circuit places the burden of proving prejudice or unfairness on the claimant.

5          The ALJ can develop the record by (1) making a reasonable attempt to obtain

6  medical evidence from the claimant's treating sources, (2) ordering a consultative examination

7  when the medical evidence is incomplete or unclear and undermines ability to resolve the

8  disability issue; (3) subpoenaing or submitting questions to the claimant's physicians; (4)

9  continuing the hearing; or (5) keeping the record open for supplementation.  See Tonapetyan, 242

10  F.3d. at 1150; 20 C.F.R. 404.1517, 416.917; 42 U.S.C. § 423(d)(5)(A), (B).  Ordering a

11  consultative examination ordinarily is discretionary, see Wren v. Sullivan, 925 F.2d 123, 128

12  (5th Cir.1991); Jones v. Bowen, 829 F.2d 524, 526 (5th Cir.1987), and is required only when

13  necessary to resolve the disability issue.  See Reeves v. Heckler, 734 F.2d 519, 522 (11th

14  Cir.1984); Turner v. Califano, 563 F.2d 669, 671 (5th Cir.1977).

15          Plaintiff has a statutory right to counsel at the administrative hearing which may

16  be knowingly and intelligently waived.  Duns v. Heckler, 586 F. Supp. 359, 364 (N.D. Cal.

17  1984), citing Ware v. Schweiker, 651 F.2d 408 (5th Cir. 1982), Floyd v. Schweiker, 550 F. Supp.

18  863 (N.D. Ill. 1982).  Even if the waiver is deficient, plaintiff must demonstrate prejudice or

19  unfairness in the proceedings in order to obtain a remand.  Hall v. Secretary of Health, Educ. &

20  Welfare, 602 F.2d 1372, 1378 (9th Cir. 1979).  The real issue, however, is not whether the waiver

21  was knowing or intelligent, but whether without the representation, the ALJ met his burden "to

22  conscientiously and scrupulously probe into, inquire of, and explore for all the relevant facts" in

23  order to protect plaintiff's interest.  Id., quoting Vidal v. Harris, 637 F.2d 710, 713 (9th Cir.

24  1981); Cox v. Califano, 587 F.2d 988 (9th Cir. 1978).  This duty includes diligently ensuring that

25  both favorable and unfavorable facts and circumstances are elicited at hearing.  Key v. Heckler,

26  754 F.2d 1545, 1551 (9th Cir. 1985).  The ALJ must fully and fairly develop the record, and when

a claimant is not represented by counsel, an ALJ must be "especially diligent in exploring for all relevant facts." Tonapetyan v. Halter, 242 F.3d 1144 (9th Cir. 2001). Only if the plaintiff can show prejudice or unfairness in the administrative proceeding as a result of not having counsel is remand warranted. Vidal, 637 F.2d at 713.

1.  Failure to Advise Plaintiff of His Right to an Attorney at the Administrative Hearing

Plaintiff contends that the ALJ's failure to give plaintiff any notice of his right to counsel at the hearing placed plaintiff at a severe disadvantage, especially because both plaintiff and his niece, who appeared as his representative, failed to ask the vocational expert any questions. Plaintiff points out several irregularities. Although Ms. Phong, plaintiff's niece, stated that she was there to help plaintiff and would speak for him, the ALJ had to remind her to pay attention twice during the hearing. When asked whether she wanted the vocational expert's testimony translated for plaintiff, Ms. Phong declined. She also failed to ask both plaintiff and the VE any questions during the hearing. In regard to this last failure, the result was that the VE testified only about plaintiff's past work, and was not asked any hypothetical questions, or any questions involving a right elbow limitation. The ALJ also failed to ask plaintiff about his functional capacity to lift or carry, and about any other limitations resulting from his right arm impairment.

Defendant makes much of the fact that plaintiff was notified on four separate occasions of his right to representation well before the hearing. (Tr. at 44, 48, 52, 60.) However much this may be true, all notices were in English, and there is no evidence that they were translated for plaintiff. Such questioning could have been translated for plaintiff at the hearing through the appointed interpreter in the event that he had not previously been aware of his right to counsel. In any event, the issue is not how much notice plaintiff was given, but whether any prejudice resulted at the hearing.

It should be clarified that plaintiff immigrated to the United States from Laos in

1    1990, has had no schooling, and had sufficiently poor English language skills that he required an

2    interpreter for the administrative hearing.  (Tr. at 451, 447.)  Despite this background, plaintiff's

3    niece, May Phong, represented him at the hearing, and waived interpretation of the vocational

4    expert's testimony.  (Id. at 455.)  Plaintiff's other assertions regarding Ms. Phong's

5    representation at the hearing are well founded.  She had to be told twice to pay attention to the

6    proceedings, and she did not ask plaintiff or the vocational expert any questions.  (Id. at 449,

7    453.)

8            The hearing transcript reveals that the ALJ did not fully develop the pertinent

9    subject areas.  To start with, the ALJ did not ask plaintiff about his experience with the English

10   language.  This is especially significant because the vocational expert's testimony was not

11   translated for plaintiff based on his niece's decision that translation was unnecessary.  (Id. at

12   455.)  Furthermore, the ALJ did not ask plaintiff whether he had reviewed his records, whether

13   he needed more time to review them, or whether he had any objections or problems with them.

14   In regard to specific subject areas, the ALJ did not ask plaintiff about his nature, degree or areas

15   of symptoms, medical history, including frequency and purpose of visits, the names of doctors

16   visited, any other treatment he was getting such as physical therapy, how long he could do certain

17   activities, especially lifting and carrying, the extent of his functional limitations with respect to

18   his right elbow and rib cage including the effect of any pain on these limitations, and whether he

19   wished to testify to anything else.[3]  (Id. at 447-54.)

20           Although the ALJ did ask for plaintiff's medications, he merely noted them, and

21   did not ask about side effects, how often plaintiff took them, or if they improved plaintiff's pain

22   and to what extent.  (Id. at 453-54.)

23           The lack of counsel was most evident in plaintiff's inability to cross-examine the

24   vocational expert, either personally or through his representative.  Although the ALJ had

25

26           [3]  He did ask plaintiff's niece whether she had any questions of her client and she
     responded in the negative.  (Id. at 454.)

1    previously asked plaintiff how long he had worked at certain past jobs and why he could no

2    longer work at them, he did not question plaintiff about what those jobs entailed, but rather relied

3    on plaintiff's previously written descriptions from his work history report.  (Tr. at 101-105.)  In

4    fact, the ALJ, after swearing in the vocational witness, merely asked him to summarize plaintiff's

5    vocational history by skill and exertional level.  (Id. at 455.)  The expert relied on plaintiff's work

6    history report and found the closest DOT classification.  For example, plaintiff was employed as

7    a roofer from 2000 to 2005.  (Id. at 101.)  The expert noted that construction worker was the

8    closest DOT classification, and recited its skill and exertional levels.  (Id. at 456.)  The expert

9    proceeded with each of plaintiff's past jobs and what they entailed according to plaintiff's

10   description and what DOT classification matched best.  The ALJ ended the testimony after the

11   VE's summary was completed.  He then asked plaintiff's representative if she had any questions

12   for the expert, and plaintiff's niece stated that she did not.  The ALJ then concluded the hearing.

13   (Id. at 458.)  Plaintiff did not question the vocational expert about his ability to do some of his

14   past medium level jobs based on his physical limitations and what lifting, carrying and

15   manipulative requirements were entailed by those jobs.

16         In fact, the entire hearing transcript is less than twelve pages fully transcribed.

17   Without the vocational testimony, the transcript was only nine pages long.  Longer transcripts

18   have been held inadequate.  See Battles v. Shalala, 36 F.3d 43 (8th Cir. 1994) (finding ten minute

19   hearing which was fully transcribed in eleven pages was not fully and fairly developed).  A full

20   examination of a claimant should include, among other things, questions about impairments,

21   physical (and mental) limitations, and medical care.  McCormick, Harvey L., Social Security

22   Claims and Procedures § 12:18, p. 24 (5th ed. 1998).  The ALJ here spent almost no time delving

23   into any of plaintiff's impairments, his treatment, dates of treatment, or where treatment was

24   obtained.  The only questions the ALJ asked about treatment was why plaintiff was using a cane,

25   who prescribed it and when.  He then asked to see plaintiff's medications.  (Id. at 453.)

26         Plaintiff's representative was so ineffective that she was the equivalent of having

8

1    no representative.  Where a plaintiff is unrepresented, the ALJ must be especially diligent.  The

2    ALJ did not adequately develop the hearing record in this case.  On remand, the ALJ shall re-call

3    the vocational expert to testify regarding plaintiff's elbow limitation and the light work

4    recommendation by Dr. Momi and the SSA physician as described later in this opinion.

5                        2.  Failure to Re-Contact Plaintiff's Treating Physician

6                Plaintiff next contends that the ALJ failed to develop the record when he did not

7    re-contact plaintiff's treating physician, Dr. Farey, for clarification of her December 3, 2007

8    letter which states that after two surgical attempts to repair plaintiff's right elbow, "he still has

9    very limited elbow function, resulting in a permanent and stationary disability."  (Id. at 108.)  The

10   ALJ gave this opinion minimal weight, explaining only that a physician statement that a plaintiff

11   is unable to work is not a medical opinion but an opinion that is reserved solely to the

12   Commissioner.

13               The ALJ has an independent duty to contact reporting medical sources to resolve

14   ambiguities and adequately evaluate the evidence.  20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1);

15   Social Security Ruling SSR 96-5p ("For treating sources, the rules also require that we make

16   every reasonable effort to re-contact such sources for clarification when they provide opinions on

17   issues reserved to the Commissioner and the bases for such opinions are not clear to us").

18               In this case, Dr. Farey completed a residual functional capacity evaluation on July

19   9, 2008, about seven months after the aforementioned letter.  At that time, she opined that based

20   on plaintiff's right elbow olecronan fracture post two attempted surgical repairs, plaintiff could

21   only sit, stand or walk for two hours each in an eight hour day.  He could only sit or stand for

22   thirty minutes before he needed to change positions.  (Id. at 442.)  He could only walk around

23   every 60 minutes, and could only walk for 15 minutes each time.  He would need to be able to

24   shift at will from sitting or standing/walking and take unscheduled breaks for ten to fifteen

25   minutes at a time before returning to work.  (Id. at 443.)  Dr. Farey concluded that plaintiff

26   should not do heavy manual labor.  (Id. at 444.)  This opinion was based solely on plaintiff's

9

1  right elbow fracture.  (Id. at 442.)

2          The ALJ was not required to delve further into the reasons for Dr. Farey's

3  disability analysis as he properly rejected her opinion on disability.  There are no findings in the

4  medical records that would support limitations of the degree described by Dr. Farey in her RFC.

5  Plaintiff's ability to sit, stand, walk and necessity to take breaks should not be affected by his

6  right elbow limitation, which is the only real limitation remaining.  (Tr. at 18.)  In fact, Dr.

7  Farey's RFC is so inconsistent with the medical record that one might infer she was acting as an

8  advocate for plaintiff.  See Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992) (ALJ may

9  reject medical opinion where doctor acts as an advocate in claimant's pursuit of benefits).

10         Further, to the extent he claims he has a rib cage limitation, Dr. Momi conducted

11 an internal medical consultation and noted that plaintiff's right side of his chest rib cage hurt only

12 when "he does sneeze or cough, but no pain on the regular movements."  (Id. at 348.)

13 Furthermore, although plaintiff testified that he used a cane at the hearing because he had

14 difficulty walking, he told Dr. Momi that he walked with a cane for about a month after the

15 October 26, 2005 car accident, but at the time of this February 21, 2006 consultation, he "denies

16 any problem in walking."  (Id. at 348.)

17         Dr. Momi diagnosed status post open reduction internal fixation of the fracture of

18 the olecranon process, history of fracture of the right rib cage, and history of gunshot wound and

19 chest tube placement on right side.  He opined that exam of the rib cage and chest injuries was

20 normal with no limitation.  Plaintiff could sit, stand and walk without limitation.  The right

21 elbow fracture did limit plaintiff's range of motion so that he could not do heavy lifting and

22 carrying, or a job requiring full movement of the right elbow, but this situation could improve in

23 two to three months with physical therapy.[4]  At the time of this exam, plaintiff could lift and

24 carry ten pounds frequently and twenty pounds occasionally.  There was no limitation in bending,

25  ─────────────────

26      [4] At the time of this exam, plaintiff was going to physical therapy once a week.  (Id. at 348.)

stooping or over head reaching.  Dr. Momi thought that with physical therapy and his own efforts plaintiff could improve enough in a couple of months such that "he may or may not have any limitations."  (Id. at 350.)

The SSA physician, Dr. Pong, made similar findings.  He opined on March 9, 2006, that plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for six hours, sit for six hours, and could do unlimited pushing and pulling.  (Id. at 341.)  Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl.  (Id. at 342.)  These restrictions were based on decreased range of motion of the elbow which Dr. Pong thought was severe at the time but which he thought would improve to the point where plaintiff could do the full range of light work in less than twelve months.  (Id. at 345.)

Furthermore, as defendant points out, Dr. Farey's treatment notes, dated the same day as her opinion on disability, indicated that plaintiff could extend his right elbow 135 degrees. See www.merckmanuals.com (normal elbow extension is 145 degrees.)  (Id. at 170.) Significantly, there is no mention of elbow flexion.  Other treating records indicate that despite two courses of physical therapy, plaintiff's range of motion of the elbow remained limited.  (Tr. at 163, 167-70, 112, 117.)  Therefore, Dr. Momi's opinion appears to reflect the true state of affairs: that plaintiff could lift only ten pounds frequently and 20 pounds occasionally, and did have a right elbow limitation, but that the remainder of his functional capacity was not otherwise affected.

An ALJ has an independent duty to develop the record when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.  Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001);[5] Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996).  Here, because the record was

_____

[5] As the Ninth Circuit summarized in Tonapetyan, 242 F.3d at 1150 (citations and internal quotations omitted):

The ALJ in a social security case has an independent duty to fully and fairly

not ambiguous or inadequate, and because there was no need for clarification based on Dr.

Farey's RFC form which was clearly lacking a medical basis, the ALJ was not required to contact

Dr. Farey again to determine the meaning behind her opinion of disability.

B. Whether the ALJ Failed to Properly Assess Plaintiff's Residual Functional Capacity

and Therefore Improperly Found Plaintiff Capable of Performing His Past Work

Plaintiff next claims that the ALJ erred by failing to properly assess plaintiff's

RFC, thereby finding him capable of performing his past work as an assembler.  This job is

medium work, both as described by plaintiff and according to the DOT definition.  The ALJ

recited plaintiff's description of this job:

> [H]e had to assemble sheet metal by hand and by machine.  In
> doing so, he also needed to do some wiring.  He used machines,
> tools, and equipment.  He used technical knowledge or skills.  He
> wrote, completed reports, or performed other such duties.  During
> an 8-hour workday, he stood for 2-3 hours, walked for 1-2 hours,
> sat for 2 hours, stooped for 1 hour, reached for 1 hour, and
> handled, grabbed, or grasped for 8 hours.  The heaviest weight he
> lifted was 100 pounds or more, and he frequently lifted 50 pounds
> or more.

(Tr. at 23.)  See tr. at 102.

The VE equated this job to a specific listing in the DOT [6]:

---

develop the record and to assure that the claimant's interests are considered.  This
duty extends to the represented as well as to the unrepresented claimant. . . . The
ALJ's duty to develop the record fully is also heightened where the claimant may
be mentally ill and thus unable to protect her own interests.  Ambiguous evidence,
or the ALJ's own finding that the record is inadequate to allow for proper
evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate
inquiry.  The ALJ may discharge this duty in several ways, including:
subpoenaing the claimant's physicians, submitting questions to the claimant's
physicians, continuing the hearing, or keeping the record open after the hearing to
allow supplementation of the record.

[6]  The United States Dept. of Labor, Employment & Training Admin., Dictionary of
Occupational Titles (4th ed. 1991), ("DOT") is routinely relied on by the SSA "in determining
the skill level of a claimant's past work, and in evaluating whether the claimant is able to
perform other work in the national economy."  Terry v. Sullivan, 903 F.2d 1273, 1276 (9th Cir.
1990).  The DOT classifies jobs by their exertional and skill requirements.  It is used by the SSA
to classify jobs as skilled, unskilled, or semiskilled.  (Id.)  The DOT is a primary source of

1

> Assembles metal products, such as vacuum cleaners, valves, or
> hydraulic cylinders, partially or completely, working at bench or on
> shop floor: Positions parts according to knowledge of unit being
> assembled or following blueprints. Fastens parts together with
> bolts, screws, speed clips, rivets, or other fasteners, using
> handtools and portable powered tools. May remove small
> quantities of metal with hand files and scrapers to produce close fit
> between parts. May operate drill presses, punch presses, or riveting
> machines to assist in assembly operation. May disassemble power
> brake boosters, air-brake compressors, and valves for salvage of
> parts and be designated Disassembler, Product (machine shop).
> May assemble and test patient lifting devices and be designated
> Assembler, Patient Lifting Device (protective dev.). Usually
> specializes in assembly of one type of product.

2

3

4

5

6

7

8

9  DICOT 706.684-018.

10          Plaintiff objects to the ALJ's finding because no doctor found plaintiff capable of

11  medium work.  According to SSR 82-62, the determination that a claimant has the requisite

12  capacity to perform a past relevant job must include not only findings of fact as to the

13  individual's Residual Functional Capacity and the physical and mental demands of the past

14  job/occupation, but also a specific finding of fact that the individual's Residual Functional

15  Capacity would permit a return to this past job or occupation.  See SSR 82-62.  Here, the ALJ's

16  finding of fact that plaintiff could do his past work is not supported by the evidence.

17          Although it is true, as defendant states, that plaintiff could touch his fingertip to

18  his nose on December 14, 2005, (tr. at 109), his overall progress in regard to his right elbow was

19  not this satisfactory.  Although plaintiff underwent physical therapy, it was not ultimately

20  successful.  On July 12, 2006, at the end of this treatment, plaintiff's range of motion in his right

21  elbow was 45-80 degrees.  (Id. at 119.)  It was noted on July 19, 2006, that plaintiff's range of

22  motion in his elbow was 30/75, with the notation, "likely plateaued."  (Id. at 163.)

23  Incomprehensibly, only one month earlier, on June 13, 2006, plaintiff's range of motion at a visit

24  with treating physician Dr. Farey was 135 degrees.  (Id. at 161.)  At this visit, plaintiff's elbow

25  _____

26  reliable job information for the Commissioner.  20 C.F.R. § 404.1566(d)(1).

1    was his primary complaint.  (Id.)

2           Plaintiff continued to have limited range of motion of his elbow through May,

3    2007, long after he was able to touch his finger to his nose on one occasion.  (Tr. at 163, 167-70,

4    112, 117, 349.)   Nevertheless, there were instances of improvement over time.  On May 14,

5    2007, range of motion was limited at 110-150 degrees, and the notation was made, "motion

6    limits hard."  (Id. at 167.)  On December 3, 2007, plaintiff could extend his elbow to 135

7    degrees, which is short of full range by only ten degrees.[7]  www.merckmanuals.com.  (Id. at 170.)

8           Even though Dr. Momi thought plaintiff could work, he did limit plaintiff to light

9    work.  (Id. at 350.)  The SSA physician also limited plaintiff to light work.  (Id. at 340-47.)  No

10   physicians thought plaintiff could do medium work.  A finding of medium work based on Dr.

11   Momi's speculation that plaintiff's right elbow "may or may not" improve in a couple of months

12   is not based on substantial evidence.

13          Because plaintiff did not have competent representation and the ALJ did not fulfill

14   his duty to ensure proper development of the vocational testimony, it is unknown what plaintiff

15   could do based on the functional limitation in his right elbow.

16          Hypothetical questions posed to a vocational expert must include all the

17   substantial, supported physical and mental functional limitations of the particular claimant.

18   Flores v. Shalala, 49 F.3d 562, 570-71 (9th Cir.1995); see Light v. Social Sec. Admin., 119 F.3d

19   789, 793 (9th Cir.1997).  If a hypothetical does not reflect all the functional limitations, the

20   expert's testimony as to available jobs in the national economy has no evidentiary value.

21   DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  But see Thomas v. Barnhart, 278 F.3d

22   947 (9th Cir. 2002) (approving hypothetical directing VE to credit specific testimony which VE

23   had just heard); Matthews v. Shalala, 10 F.3d 678 (9th Cir. 1993) (failing to include all

24   limitations in a hypothetical may be harmless error if the ALJ's conclusions are supported by

25          ────────────────
26          [7]  Defendant has mistakenly characterized this record by noting that plaintiff could bend his elbow.  Def.'s Mot. at 14:8.

1  other reliable evidence).  While the ALJ may pose to the expert a range of hypothetical questions,

2  based on alternate interpretations of the evidence, substantial evidence must support the

3  hypothetical which ultimately serves as the basis for the ALJ's determination.  Embrey v. Bowen,

4  849 F.2d 418, 422 (9th Cir. 1988).[8]

5         Therefore, the case must be remanded for further vocational testimony as to

6  whether plaintiff can do other work based on the right elbow limitation set forth by Dr. Momi,

7  the doctor's opinion that plaintiff could perform light work, or based on further consultative

8  exam if one is found to be necessary.

9  CONCLUSION

10        Accordingly, IT IS ORDERED that plaintiff's Motion for Summary Judgment is

11  GRANTED in part pursuant to Sentence Four of 42 U.S.C. § 405(g), and this matter is remanded

12  for further evidence as set forth herein.  The Clerk is directed to enter Judgment for plaintiff.

13  DATED: 02/28/2011

14                              /s/ Gregory G. Hollows

15                              _____
                                GREGORY G. HOLLOWS
16  GGH/076                     U.S. MAGISTRATE JUDGE
    Saelee2183.ss.wpd

17

18

19

20

21

22

23

24
    _____
25     [8]  Similarly, "[t]he ALJ is not bound to accept as true the restrictions presented in a
    hypothetical question propounded by a claimant's counsel."  Magallanes v. Bowen, supra, 881
26  F.2d at 756.  The ALJ is free to accept them if they are supported by substantial evidence or
    reject them if they are not.  Id. at 756-757.

15